IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM KARASEK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIV. ACTION NO. 1:08cv208-CSC |
| ) | (WO) |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

The plaintiff, William Karasek ("Karasek"), applied for disability insurance benefits pursuant to 42 U.S.C. § 401, *et seq.*, and supplemental security income benefits pursuant to Title XVI, 42 U.S.C. § 1381 *et seq.*, alleging that he was unable to work because of a disability. His application was denied at the initial administrative level. Karasek then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The Appeals Council's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[1]  *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C.

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

§ 405(g) and § 1631(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to entry of final judgment by the United States Magistrate Judge.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner is due to be reversed and this case be remanded for further proceedings.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. § 404.1520, §416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. ADMINISTRATIVE PROCEEDINGS

Karasek was 53 years old at the time of the hearing before the ALJ. (R. 411.) He is a high school graduate. (*Id.*) Karasek's prior work experience includes working as a courier. (R. 262.) Karasek alleges that he became disabled on October 1, 2002, due to depression,

---

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

3

cardiovascular disease, hypertension, hip and back pain, a cervical spine impairment, a herniated disc, recurring rectal villous adenoma, and fecal incontinence. (R. 98, 417, 419, 421-23, 435, 438, 443.) Following the hearing, the ALJ concluded that Karasek has severe impairments of mild osteoarthritis of the hips, cyst on acetabulum bilaterally right and left, disc bulge at C5-6 with occasional radiculopathy, status post colon surgery, atrial fibrillation controlled by medication, and a mild affective disorder. (R. 18, 24.) The ALJ also determined that Karasek is unable to perform his past relevant work, but that he retains the residual functional capacity to perform light work. (R. 31.) Based on the testimony of a vocational expert, the ALJ concluded that there were a significant number of jobs existing in the national economy that Karasek could perform, including work as a courier, mail clerk, and mailer.[4] (R. 25.) Accordingly, the ALJ concluded that Karasek was not disabled. (*Id*.)

### IV. THE PLAINTIFF'S CLAIMS

Karasek presents the following issues for the court's review:

(1)   The Commissioner's decision should be reversed, because the ALJ failed to provide specific reasons for rejecting the testimony provided by Karasek and by also failing to apply the pain standard.

(2)   The ALJ erred by refusing to give substantial weight to Karasek's treating physician, Dr. Campbell.

(3)   The ALJ erred in not finding Karasek's fecal incontinence a major impairment.

---

[4] The ALJ concluded that Karasek would be unable to return to his past work as a courier at "the heavy level," but that he could perform work as a "courier (DOT #230.663-010), an unskilled (SVP of 2), light occupation." (R. 24-25.)

(Doc. No. 12, p. 9.)

## V.  DISCUSSION

Karasek raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence.  *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  However, the court pretermits discussion of all of Karasek's specific arguments because the court concludes that the ALJ erred as a matter of law and, thus, this case is due to be remanded for further proceedings.  Specifically, this court determines that the Commissioner erred by failing to consider Karasek's subjective complaints of pain.

"Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the plaintiff complains is *itself* sufficient to sustain a finding of disability."  *Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987).  The Eleventh Circuit has established a three-part test that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms.  *Landry v. Heckler,* 782 F.2d 1551, 1553 (11th Cir. 1986); *see also Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  This standard requires evidence of an underlying medical condition *and either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain.  *Landry, supra*.

In this circuit, the law is clear.  The Commissioner must consider a claimant's

5

subjective testimony of pain if he finds evidence of an underlying medical condition, and one of the two *Landry* tests. *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986); *Landry*, 782 F.2d at 1553.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995); *Jones v. Dept. of Health & Human Servs.*, 941 D.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Foote*, 67 F.3d at 1562, *quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court). Thus, if the Commissioner fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Commissioner has, as a matter of law, accepted the testimony as true. This rule of law is well-established in this circuit. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991)*; Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986).

Karasek alleges that he suffers pain as a result of his neck, back, and hip condition. Karasek testified that it is impossible for him to sit without suffering pain, that the pain in his neck and shoulders is "pinchy, it's sometimes stabbing, sometimes constant," that the pain

radiates from the upper neck area down to his left or right hand, and "feels like a piece of meat that's being stretched." (R. 421-22.) He also testified that he feels a "constant stab" along his lower back, that he is unable to lift things, and that he suffers from hip pain which is somewhat alleviated "[i]f [he] sit[s] on [his] left cheek and leave[s] [the other] side up." (R. 423, 440.)

The medical records demonstrate that Karasek's spinal condition has steadily worsened. In October 2001, an MRI of the cervical spine indicated the following:

1. Ventral stabilization plates fusing the bodies of the sixth and seventh cervical vertebra accompanied by straightening of the normal cervical lordosis without misalignment.

2. C5-6 broad central towards left posterolateral disk herniation encroaching upon left lateral recess at C6 nerve root exit zone. In addition, there is uncontrovertebral spurring moderately encroaching upon the neural foramina.

3. C4-5 small central disk herniation indenting the cal sac.

4. Incidental T2-3 and T3-4 extradural defect slightly reflecting small disk herniations indenting the cal sac.

(R. 177.)

On May 1, 2002, Karasek was examined by Dr. Robert Meigs, an internist, for his complaints of back pain. Dr. Meigs noted that Karasek suffers from chronic low back pain and wished to discontinue his prescription of Percocet.[5] Dr. Meigs prescribed a Duragesic

---

[5] Percocet is comprised of Oxycodone and Acetaminophen and is indicated for the relief of moderate to moderately severe pain. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 1126.

7

patch.[6]  On November 21, 2002, Karasek returned to Dr. Meigs with complaints of back pain. (R. 384.)  Dr. Meigs diagnosed Karasek as suffering from lumbar disc disease and renewed his prescription for a Duragesic patch.  (*Id*.)

On January 14, 2003, Karasek was examined by Dr. Wayne R. Campbell, an internist. Dr. Campbell noted that Karasek's current medications included a Duragesic patch, Hydrocodone rarely, Lorazepam, and Atenolol.[7]  (R. 183.)  Dr. Campbell determined that Karasek suffered from degenerative disc disease, S/P cancer of the tongue, and villous adenoma of the colon.  (R. 183.)  He prescribed a Duragesic patch and Atenolol and referred Karasek to a pain management physician for continuation of his narcotic medication.  (Id.)

During his first visit to Dr. David Norfleet, a doctor of osteopathic medicine, on March 21, 2003, Karasek complained of lack of sleep and a funny sensation in his neck, arms, and legs.  (R. 329, 331.)  In a report to Dr. Campbell, Dr. Norfleet diagnosed Karasek as suffering from degenerative disc disease of the cervical and lumbar spine and anxiety-

---

[6] Duragesic is a transdermal system providing continuous systemic delivery of fentanyl, a potent opioid analgesic, for 72 hours.  PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 2352.

[7] Hydrocodone is pain medication used to control moderate to severe pain.  http://www.rxlist.com/cgi/generic/hydrocod_pi.htm.  Side effects include lightheadedness, dizziness, drowsiness, lethargy, nausea and vomiting.  http://www.rxlist.com/cgi/generic/hydrocod_ad.htm.

Lorazepam is used to treat anxiety, depression and insomnia.  It may cause drowsiness and dizziness. http://www.rxlist.com/cgi/generic/loraz_pi.htm.

Atenolol, otherwise known as Tenormin, is indicated in the management of hypertension. http://www.rxlist.com/ateolol-drug.htm.

depression and indicated that he prescribed Valium, MS Contin, and MSIR to treat his pain.[8] (R. 330.)

During a follow-up visit to Dr. Campbell on April 2, 2003, Karasek reported that since he started taking MS Contin, Lexapro,[9] and Valium, he was able to sleep. (R. 178.) Dr. Campbell diagnosed Campbell as suffering from degenerative disc disease and recommended that he continue receiving pain management. (*Id.*) The following day, an MRI of Karasek's cervical spine indicated a neural foraminal osteopathic encroachment present on the right at C3-4 and C5-6 with some minimal focal disc bulge at C4-5. (R. 190.)

In May 2003, Dr. Norfleet renewed Karasek's narcotic prescriptions. (R. 328.) On June 19, 2003, Dr. Norfleet discontinued Karasek's prescription for Valium, renewed his prescriptions for MS Contin and MSIR, and prescribed Ativan for the treatment of his cervical degenerative disc disease. (R. 327.) On July 17, 2003, Karasek reported suffering from constipation and neck pain. (R. 326.) Dr. Norfleet recommended that Karasek continue his current medication and consider decreasing his prescription of MS Contin after his next doctor's visit. (*Id.*) On September 16, 2003, Karasek returned to Dr. Norfleet's office with

---

[8] Valium is indicated for the management of anxiety disorders or for the short-term relief of anxiety. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 2765.

MS Contin tablets are a controlled-release oral formulation of morphine sulfate indicated for the management of moderate to severe pain when a continuous around-the-clock opioid analgesic is needed for an extended period of time. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 2678.

MSIR tablets contain morphine sulfate for oral administration and is a conventional immediate release product. http://www.purduepharma.com/PI/Prescription/MSIR.pdf.

[9] Lexapro is indicated for the treatment of major depressive disorder. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 1176.

complaints of neck pain with intermittent numbness and tingling sensations down both arms. (R. 325.) Dr. Norfleet noted that Karasek's range of motion was full in all directions with pain at extremes and diffuse tenderness. (*Id*.) The doctor diagnosed Karasek as suffering from idiopathic cervicalgia and recommended that he continue his narcotic medications and consider receiving cervical epidural steroid injections to treat his chronic pain. (*Id*.)

In September 2003, Karasek's parents contacted Dr. Norfleet and expressed concern about his use of narcotic medications. (R. 324.) The parents reported that Karasek falls asleep at the table and that his driving is erratic. (*Id*.) A couple of days later, Karasek discussed the problem with Dr. Norfleet and indicated an interest in receiving a cervical epidural steroid injection. (*Id*.) In October 2003, Karasek returned to Dr. Norfleet, reporting a pain scale of 5/10. (R. 323.) Dr. Norfleet recommended "titrate MSIR down, decrease Ativan" and that Karasek receive a cervical epidural steroid injection. (*Id*.) On December 9, 2003, Dr. Norfleet noted that the range of motion of Karasek's cervical spine was full in all directions with pain at extremes and diffuse tenderness. (R. 322.) Karasek reported a pain scale of 5/10 and difficulty sleeping. (R. 321.) Dr. Norfleet diagnosed Karasek as suffering from idiopathic cervicalgia, degenerative disc disease cervical and lumbar spine, and anxiety-depression. (R. 322.)

The following day, Karasek received a C5-6 epidural Depo-Medrol injection.[10] (R. 320.) On December 23, 2003, Karasek returned to Dr. Norfleet requesting a reduction in

---

[10] Depo-Medrol is an anti-inflammatory glucocorticoid for intramuscular, intrasynovial, soft tissue, or intralesional injection, which is indicated for the treatment of certain arthritic conditions. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 2607.

morphine and reporting a pain scale of 5/10 and good relief from the cervical epidural. (R. 317.) During an office visit on January 15, 2004, Karasek reported that his neck pain had improved. (R. 315.) Dr. Norfleet recommended that Karasek continue taking Ativan once a day and MSIR for breakthrough pain and to decrease his MS Contin from 60 milligrams to 30 milligrams. (R. 315.) On February 12, 2004, Karasek complained to Dr. Norfleet that his neck pain seemed to be getting worse. (R. 314.) Dr. Norfleet noted that Karasek suffered from numbness down his right arm and that the range of motion of his cervical spine was full with tenderness at the midline. (*Id*.) The doctor recommended that Karasek increase his MSIR to 60 milligrams twice a day and add Neurontin 300 milligrams titrated up to three times a day.[11] (*Id*.) On March 12, 2004, and March 19, 2004, Karasek went to Dr. Norfleet's office complaining of neck pain with right arm numbness. (R. 310, 312.) Dr. Norfleet noted mild tenderness of the cervical spine, diagnosed Karasek as suffering form post-operative spine surgery syndrome, and recommended that he continue his current medications, discontinue Neurontin, and receive a C5-6 foraminal epidural. (R. 311-12.)

On March 23, 2004, Karasek received a right C5-6 foraminal injection of Depo-Medrol. (R. 309.) On April 4, 2005, Karasek was examined by Dr. Jerold A. Derkaz, a consultative physician. Dr. Derkaz noted that Karasek reported neck pain that was chronic, constant, and radiated to his shoulder, as well as generalized muscular pain, joint stiffness, joint swelling, and back pain. (R. 222.) The consultative physician recommended no

---

[11] Neurontin is indicated for the management of postherpic neuralgia in adults. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 2463.

overhead work, no lifting more than 20 pounds, no repetitive pushing or pulling, and diagnosed Karasek as suffering from (1) degeneration of cervical intervertebral disc, (2) syndrome, postlaminectomy, cervical region, (3) brachial neuritis or radiculitis nos, (4) depression with anxiety, (5) hypertension, (6) history of glossal CA with partial glossectomy, (7) chronic abdominal pain with history of colon polyps, and (8) incontinence of feces. (R. 224.)

During a follow-up visit to Dr. Norfleet's office on April 6, 2004, Karasek complained of neck pain and reported good relief from the epidural. (R. 308.) Dr. Norfleet recommended that Karasek continue taking his current narcotic medications and discontinue MSIR. (*Id.*) On May 6, 2004, Karasek indicated that his neck pain had improved somewhat since receiving the injection. (R. 307.) Dr. Norfleet prescribed Lortab and Ativan and recommended that Karasek discontinue MS Contin.[12] (*Id.*) On June 2, 2004, Karasek reported neck pain and radicular pain down his left arm. (R. 306.) Dr. Norfleet noted that the range of motion of Karasek's cervical spine was slightly decreased with lateral rotation and that he had diffuse tenderness posteriorly. (*Id.*) Dr. Norfleet recommended that he continue taking his current medications and undergo a cervical MRI. (*Id.*)

On June 15, 2004, a radiologist assessed the results of an MRI of Karasek's cervical spine as follows:

---

[12] Lortab is a combination of acetaminophen and hydrocodone bitartrate, an opioid analgesic and antitussive, supplied in tablet form for oral administration. PHYSICIANS' DESK REFERENCE, 53rd ed. (1999) at p. 3162.

Ativan, otherwise known as Lorazepam, is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. http://www.rxlist.com/ativan-drug.htm.

> Very minimal posterior midline focal disc protrusion at C4-5. Disc protrusion at C5-6 midline posterior to the left with some mild right lateral extension present as well. This appears to be at least partially calcified; it could also represent osteophyte changes.
>
> Status post anterior fusion at C6 and C7. Hard disc material and/or osteophyte production at C5-C6, predominantly midline posterior to the left but with some right lateral involvement as well.

(R. 189.)

On June 25, 2004, Karasek returned to Dr. Norfleet's office with complaints of neck and left shoulder pain. (R. 305.) Dr. Norfleet noted that an examination of the cervical spine indicated tenderness to deep palpation in the cervical spine on the left side and that range of motion was painful at extremes. (R. 305.) The doctor recommended that Karasek continue his current medications and receive an epidural injection. (R. 305.) On July 2, 2004, Karasek went to Dr. Norfleet's office with complaints of increasing neck and left arm pain. (R. 304.) Dr. Norfleet recommended that he continue his current medications of Lortab and Ativan and that he receive an epidural injection. (R. 303-04.)

During a visit to Dr. Norfleet's office on July 21, 2004, Karasek indicated that his pain scale was 5/10. (R. 302.) Dr. Norfleet prescribed Gabitril and recommended an epidural injection.[13] (*Id.*) On August 4, 2004, Karasek received a C5-6 epidural injection of Depo-Medrol. (R. 300.) On August 18, 2004, Dr. Norfleet noted marked improvement of Karasek's neck and left shoulder pain and prescribed MSIR and Ativan. (R. 299.) On

---

[13] Gabitril is an anti-epilepsy drug. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 964.

October 15, 2004, Karasek returned to Dr. Norfleet complaining of neck pain. (R. 298.) Dr. Norfleet noted that Karasek had taken his entire prescription of 100 tablets of MSIR over the past two weeks. (*Id*.) The doctor recommended that Karasek discontinue MSIR and prescribed MS Contin. (*Id*.)

On June 14, 2005, Karasek returned to Dr. Norfleet's office complaining that his pain symptoms had worsened, that he suffered from heel spur pain, and that his pain scale was a 7/10. (R. 296.) Dr. Norfleet prescribed Ativan and MS Contin. (R. 296.) On September 6, 2005, Karasek presented to Dr. Norfleet's office with complaints of head, neck, and shoulder pain and a pain scale of 8/10. (R. 380.) Dr. Norfleet prescribed MS Contin and Ativan and recommended an epidural injection. (R. 381.) On September 12, 2005, Karasek received a C5-6 epidural injection of Depo-Medrol. (R. 294.) During a follow-up visit on October 11, 2005, Karasek reported that the injection gave him relief for approximately one week, that he suffered from head, neck, and shoulder pain, and that his pain scale was 8/10. (R. 293.) Dr. Norfleet prescribed MS Contin and Ativan. (*Id*.)

On June 12, 2006, Karasek returned to the pain clinic with complaints of neck and shoulder pain and a pain scale of 8/10. (R. 377.) Dr. Norfleet noted tenderness to deep palpation in the cervical spine and that the range of motion was painful at extremes. (R. 378.) On September 7, 2006, Karasek returned to Dr. Norfleet's office complaining of neck pain and a pain scale of 7/10. (R. 375-76.) Dr. Norfleet prescribed Avinza.[14] (R. 376.) On

---

[14] Avinza is a morphine sulfate extended-release capsule. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 731. In addition to analgesia, the widely diverse effects of morphine include drowsiness, changes in mood, respiratory depression, decreased gastrointestinal motility, nausea, vomiting, and alterals of the edocrine and autonomic nervous system. *Id.*

December 5, 2006, Karasek went to Dr. Norfleet's office complaining of neck pain with a pain scale of 8/10. (R. 373.)

On January 23, 2007, Dr. Campbell ordered an MRI of Karasek's cervical spine. (R. 364.) On February 2, 2007, an MRI of Karasek's cervical spine indicated "postsurgical changes with osteophyte production, worse at C6-C7, worse on the left than the right" and an MRI of his lower back indicated "disc changes . . . , probable angioma at L3. . . , [and] mild disc changes." (R. 361.)

On March 1, 2007, Karasek reported to Dr. Norfleet that his symptoms had worsened and that his pain scale was 8/10. (R. 371.) Dr. Norfleet diagnosed Karasek as suffering from post-operative spine surgery syndrome, radiculitis, cervicalgia, facet syndrome, and lumbago, prescribed Ativan, Phenergan, and Avinza, and recommended a neurosurgeon if his symptoms did not improve. (R. 372.)

On March 21, 2007, Thomas J. Manski, a neurological surgeon, conducted an examination and reviewed the results of an MRI performed on February 2, 2007.[15] Dr. Manski assessed the following:

1. Constant posterior neck pain and muscle spasms, and intermittent paresthesias in the right C6 distribution along with intermittent paresthesias into the third, fourth and fifth digits of the left hand.

2. The patient is status post C6-7 anterior cervical discectomy and fusion in 1996.

---

[15] On appeal, the Commissioner received additional neurological consultation evaluations from Dr. Manski. (R. 397-405.) Although the February 2, 2007 MRI records of Karasek's lumbar and cervical spine were included in the record at the time of the ALJ's analysis, the ALJ did not have any records from Dr. Manski at the time he entered his decision to deny benefits.

15

> 3. The patient with a disc/osteophyte complex at C5-6 on MRI with some spinal stenosis, lateral recess stenosis and neural foraminal stenosis.
>
> 4. Some mild spinal stenosis at C6-7 as a result of a posteromarginal osteophyte at the fused level at C6-7 with additional mild degenerative disc changes, as noted under radiographic studies. . . .
>
> 5. MRI of the lumbosacral spine showing multilevel disc bulges and posteromarginal osteophytes from L1-2 down through L5-S1 with, perhaps, a disc bulge/protrusion at L2-3, as described under radiographic studies above with apparent vertebral body hemangiomas at L3 and L5, as well.
>
> 6. Four-month history of right low back pain, superior right iliac crest pain and superior right buttock pain.
>
> 7. Complaints of bilateral hip pain and arthralgias to multiple joints of the body including the hands and fingers.

(R. 399-400.) An x-ray of Karasek's hips conducted on March 22, 2007, indicated "mild bilateral subchondral cyst formation . . . [and] spurring." (R. 382.) During a follow-up visit in September 2007, Dr. Manski conducted an additional examination and reviewed x-rays of Karasek's hips, as well as a CT scan and MRI of his back, conducted on June 13, 2007. (R. 404.) Dr. Manksi noted that the radiographic studies indicated "some facet arthritis" along the lumbosacral spine. (*Id.*) The neurologist assessed: (1) right low back pain, right posterior iliac crest pain and superior right buttock pain; and (2) MRI of lumbosacral spine showing multilevel disc bulges throughout the lumbosacral spine, as well as an area of abnormal signal within the L3 vertebral body, possibly consistent with a hemangioma with no significant interval change from the February of 2007 and June of 2007 MRIs with a CT scan showing no obvious bony destructive lesion or fracture, but with some mild loss of

vertebral body height within the mid-portion of the superior and inferior endplates. (R. 404-05.) Dr. Manski prescribed Lortab and Skelaxin to treat Karasek's symptoms of pain.[16] (R. 405.)

The ALJ acknowledged that Karasek has impairments that would reasonably be expected to produce the type of pain about which he complains but he concluded that his testimony was "not entirely credible." (R. 23.) In discrediting Karasek's testimony, the court replicates the ALJ's credibility determination in its entirety.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. 23.)

The ALJ wholly failed to articulate any reason for discounting the plaintiff's credibility and his pain testimony. Thus, as a matter of law, his pain testimony must be accepted as true. However, based on the hypothetical questions presented to the vocational expert, the court is unable to discern whether acceptance of Karasek's testimony concerning his neck, back, shoulder, arm, and hand pain as true would render him disabled. Consequently, this case is due to be remanded to the Commissioner for further proceedings.[17]

---

[16] Skelaxin is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. PHYSICIANS' DESK REFERENCE, 62nd ed. (2008) at p. 1753.

[17] The court also questions whether the ALJ properly discounted the opinion of Karasek's treating physician, Dr. Campbell. In assessing the medical evidence in a Social Security case, the ALJ is "required to state with particularity the weight he gave the different medical opinions and the reasons therefor." *Shafarz*

A separate final judgement will be entered.

Done this 13th day of March, 2009.

       /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

---

*v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). The opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986.); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). However, the weight afforded to a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence of the claimant's impairment. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). The ALJ may "reject the opinion of any physician when the evidence supports a contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). *See also Shafarz*, *supra*. When summarizing the medical records, the ALJ "reject[ed] Dr. Campbell's report as being inconsistent with other reports in the medical record." (R. 20.) The ALJ, however, did not state with particularity the weight he gave to Dr. Campbell's medical opinions or provide specific reasons for rejecting his opinion. Consequently, on remand, the ALJ should specify the weight accorded to Dr. Campbell's opinion, as well as any other examining physicians, such as Dr. Manski, and his reasons for accepting or rejecting Dr. Campbell's opinion that "Karasek's conditions, including degenerative disc disease, involving the lumbosacral spine, history of depression, colon polyps, high blood pressure and history of malignant neoplasm of the colon had worsened and that the claimant was permanently disabled" and his findings that Karasek's level of pain was moderate to severe, that his fatigue was moderately severe to severe, that he could sit or stand for no more than one hour a day, and that his symptoms are severe enough to interfere with his attention and concentration on a constant basis. (R. 250-257.)

On remand the ALJ also should discuss what effect, if any, Karasek's fecal incontinence has on his ability to work. In his brief, Karasek argues that the ALJ erred in failing to consider his fecal incontinence as a severe impairment. At Step Two of his analysis, the ALJ found Karasek's status post colon surgery was a severe impairment. (R. 18.) Thus, it is arguable that Karasek's fecal incontinence, which occurred as the result of numerous surgical procedures performed on his colon, was considered by the ALJ as a severe impairment. The ALJ, however, failed to specifically discuss what effect, if any, Karasek's fecal incontinence would have on his ability to work. Consequently, the ALJ should discuss this matter in more detail on remand.